```
--------------------------------- x
UNITED STATES OF AMERICA,         :
                                  :
        - against -               :        89-CR-346(LAP)
                                  :
                                  :                ORDER
                                  :
GEORGE RIVERA                     :
                                  :
                                  :
                  Defendant.      :
---------------------------------x
```

LORETTA A. PRESKA, SENIOR UNITED STATES DISTRICT JUDGE:

　　　Before the Court is Defendant George Rivera's motion[1]
pursuant to 18 U.S.C. Section 3582(c)(1)(A) (dkt. no. 932)(the
"Motion"), seeking a reduction in sentence based on a variety of
factors, including Covid-19 and several of the Section 3553(a)
factors.  Defendant is 53 years old, fully vaccinated, and
serving a life sentence.  For the reasons set forth below, the
motion is denied.

**I. Background**

A. Offense Conduct and Procedural History

　　　From approximately April 1987 to May 1989, Defendant George
Rivera led a highly structured drug trafficking organization that

---

[1] (Notice of Defendant George Rivera's Motion for a Sentence
Reduction Pursuant to 18 U.S.C. § 3582(c)(1)(A), dated June 18,
2021 [dkt. no. 932]; Memorandum of Law in Support of Defendant
George Rivera's Motion for a Sentence Reduction Pursuant to 18
U.S.C. § 3582(c)(1)(A) ("Motion" or "Mot."), dated June 18, 2021
[dkt. no. 933].)

was a primary supplier of heroin to the Bronx.  (PSR ¶ 58.)

Defendant purchased Southeast Asian heroin from Chinese

suppliers, relying on an intricate network of deputies,

lieutenants, and managers to cut and package the heroin at

"cutting mills" and distribute it through street-level "stores"

in the Bronx. (PSR ¶¶ 62-66.)  Defendant marketed his heroin

under the names "Obsession," "Hammer," "Sledgehammer,"

"Delirious," and "Candy Land."  (PSR ¶ 60.)

        By 1987, Defendant's organization was already selling

substantial quantities of heroin.  (PSR ¶ 61.)  In August of that

year, he boasted to an undercover officer that his organization

distributed approximately two kilograms of heroin per week and

grossed about $250,000.  (PSR ¶ 61.)  By 1988, the organization

included over 50 members, whom Defendant rewarded with lavish

parties and gifts, including Rolex watches, gold accessories, and

luxury cars.  (PSR ¶ 71, 81.)  In that year alone, Defendant's

organization sold over 900,000 glassines (54 kilograms) of

heroin, valued at over $9 million.  The following year, the

organization sold over 436,000 glassines of the drug (28

kilograms) valued at over $4 million.  (PSR ¶ 83.)  In addition

to stockpiling drugs and cash, Defendant's organization

maintained a cache of weapons.  For example, on February 8, 1989,

law enforcement recovered from an apartment associated with one

of Defendant's "stores" two .357 magnum revolvers, one .22

caliber revolver, and a .38 caliber revolver.  On that same day,

officers located from another apartment $50,000 in cash and approximately 5,600 glassines of heroin.  (PSR ¶ 75.)

Defendant was arrested on May 1, 1989 and remanded without bail.  He was named first in a fourteen-count indictment charging 33 defendants with twenty counts related to drug trafficking and firearms.  A few months after his arrest, law enforcement uncovered an apparent "hit list" that included the judge assigned to Defendant's case, Hon. Shirley Wohl Kram, as well as federal prosecutors Pat Fitzgerald and Henry DePippo.  A handwriting expert determined that Defendant tried to disguise his handwriting in the exemplar he submitted as part of the investigation into the hit list.  Furthermore, trial witnesses stated that Defendant had attempted to prevent their testimony by bribing them and threatening their families. (PSR ¶ 85-88.)

Defendant proceeded to trial, along with five defendants. In 1990, a jury convicted him of conspiracy to distribute and possess with intent to distribute greater than one kilogram of heroin, in violation of 21 U.S.C. § 846, and of attempted income tax evasion, in violation of 26 U.S.C. 21 U.S.C. § 7201.

On April 24, 1991, Judge Kram sentenced Defendant to life imprisonment to be followed by five years of supervised release. (Ex. 2 to Motion (Sentencing Transcript) ("Tr."), dated Apr. 24, 1991 [dkt. no. 933-2], at 31.)  During the proceeding, Judge Kram noted that she was "really shocked at what [a] dangerous and violent man" Defendant was.  Rather than a mitigating factor,

Judge Kram found that Defendant's youth made his conduct all the
more offensive: "I realize that you are very young and that makes
it more egregious, really, that someone as young as you could
have been so dangerous and caused so much harm and [done] such
terrible things to so many people."  (Id. at 30.)  Judge Kram
resolved that a leadership enhancement was appropriate for
Defendant, finding that the trial testimony had established that
"Mr. Defendant founded the organization, controlled the sources
and the sales, hired and fired people, certainly disciplined
employees, and received the proceeds of the sales." (Id.)  The
Court also concluded that an obstruction-of-justice enhancement
was appropriate, based on threats Defendant had made to
witnesses, (id. at 16-17), as well as an enhancement for
possession of weapons, finding "there were weapons present, those
weapons were loaded and they presented an increased danger of
violence. They were present in the cars, and in the mill and were
present to protect the narcotics," (id. at 31).  Finally, Judge
Kram remarked on Defendant's lack of remorse: "I don't think this
Defendant has ever accepted his responsibility, he's never
evinced recognition and acceptance of personal responsibility
[for] his conduct. And as I indicated to you earlier, I consider
you to be one of the most dangerous and violent people to come
before this Court."  (Id.)

     Defendant timely appealed his conviction, which the Court of
Appeals affirmed.  As detailed in the Motion, Defendant also

filed a series of post-conviction motions (Mot. 11-14).  As he
acknowledges in his reply (dkt. no. 937),[2] Defendant also moved
in 2015 to reduce his sentence pursuant to 18 U.S.C. § 3582(c).[3]
(Dkt. 865.)  In that motion, Defendant argued for a sentence
reduction based on Amendment 782 of the Guidelines.  According to
Defendant, his new offense level under that amendment, together
with the lengthy sentence he had already served, as well as his
record of rehabilitation while in prison, merited a sentence
reduction.  (Id.)  On March 3, 2016, this Court denied
Defendant's motion under Section 3582.  (Order, dated Mar. 2,
2016 [dkt. no. 869].)

     B. Current Custody Status

     The Defendant is currently housed at USP Beaumont in Texas.
As of July 15, 2021, USP Beaumont reported that it has zero
positive COVID-19 inmates and 235 inmates who have recovered,
with zero deaths.  2,649 inmates at FCC Beaumont, which includes
USP Beaumont, have been fully vaccinated against COVID-19,
including the Defendant.

---

[2]  (Reply Memorandum of Law in Further Support of Defendant
George Rivera's Motion for a Sentence Reduction Pursuant to 18
U.S.C. § 3582(c)(1)(A) ("Reply"), dated Aug. 2, 2021 [dkt. no.
937].)
[3]  (Motion for Modification or Reduction of Sentence Pursuant to
18 U.S.C. 3582(c)(2) Guideline Amendment 782, dated Oct. 8, 2015
[dkt. no. 865].)

C. The Defendant's Compassionate Release Motion

On August 18, 2020 Defendant filed a request with the Warden of USP Beaumont to file an 18 U.S.C. § 3582(c)(1)(A) sentence reduction motion on his behalf.  (Ex. 3 to Mot. [dkt. no. 933].) On September 17, 2020, he received a response from that Warden rejecting his request for a sentence reduction motion. (Id.)

On June 18, 2021, the Defendant, through counsel, filed the Motion seeking to reduce his sentence to time-served or else a term of imprisonment short of life.  According to the Motion, the following "extraordinary and compelling reasons" merit the relief sought: (1) even a time-served sentence would be an objectively harsh punishment given the nature and circumstances of Defendant's offense (Mot. at 28-29); (2) Defendant's history and characteristics, namely his challenging upbringing and lasting friendships (id. at 29-32); (3) Defendant's age when he committed the charged offenses (id. at 32-35); (4) Defendant's remorse, contrition, and full rehabilitation (id. at 35-42); (5) Defendant's reputation according to BOP staff at USP Beaumont (id. at 42-44); (6) the threat of COVID-19 (id. at 45-48); (7) avoidance of unwarranted sentencing disparities (id. at 48-51); (8) just punishment and respect for the law (id. at 52); (9) a time-served sentence would adequately deter Defendant and protect the public (id. 52-54); and (10) Defendant is at low risk of recidivating (id. at 54-56).

6

**II. Applicable Law**

Under Section 3582, the Court only "may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . ."  See 18 U.S.C. § 3582(c)(1)(A); see also 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples.").

The relevant Sentencing Commission policy statement is found in U.S.S.G. § 1B1.13.  That section provides that the Court may reduce the term of imprisonment if "extraordinary and compelling reasons warrant the reduction," id. § 1B1.13(1)(A); "the Defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," id. § 1B1.13(2); and "the reduction is consistent with this policy statement," id. § 1B1.13(3).

The Application Notes describe the circumstances under which "extraordinary and compelling reasons exist."  Id. § 1B1.13 Application Note 1.  Application Note 1 provides in

7

As the proponent of the motion, the Defendant bears the burden
of proving that "extraordinary and compelling reasons" exist.
See, e.g., United States v. Butler, 970 F.2d 1017, 1026 (2d Cir.
1992) ("A party with an affirmative goal and presumptive access
to proof on a given issue normally has the burden of proof as to
that issue."); United States v. Clarke, No. 09 Cr. 705 (LAP),
2010 WL 4449443, at *1 (S.D.N.Y. Oct. 29, 2010) ("If the
Defendant seeks decreased punishment, he or she has the burden
of showing that the circumstances warrant that decrease."
(quoting Butler, 970 F.2d at 1026)); cf. United States v.
Hamilton, 715 F.3d 328, 337 (11th Cir. 2013).

The relevant Guidelines policy statement counsels that a
reduction also is not proper unless "[t]he defendant is not a
danger to the safety of any other person or to the community."[4]

## III. Discussion

Because of the Warden's denial of Defendant's request for
compassionate release, (dkt. no. 933, Ex. 3), Defendant has
exhausted his administrative remedies.

As noted above, the applicable Guidelines policy statement
directs that a reduction in sentence is not proper unless "(t)he
defendant is not a danger to the safety of any other person or
to the community." (U.S.S.G § 1B1.13.) That is not the case

---

[4] U.S.S.G § 1B1.13; see also United States v. Jordan, No. 1:19-
CR-478-GHW, 2020 WL 4195353, at *2 (S.D.N.Y. Jul., 16 2020)
("The relevant policy statement is U.S.S.G. § 1B1.13.").

here.  But for consideration of his disciplinary background,
Defendant might make a marginal showing of extraordinary and
compelling circumstances meriting release.  Consideration of his
disciplinary record, however, destroys the entire undertaking.

In contrast to other defendants whom the Court has granted
early release to, see e.g. United States v. Eric Milan, No. 91
Cr. 685 (LAP), 2020 WL 1674058 (Apr. 6, 2020 S.D.N.Y.); United
States v. Robert Panton, No. 89 Cr. 34 (LAP), 2020 WL 4505915
(Aug. 4, 2020 S.D.N.Y.), this Defendant has amassed over twenty
disciplinary infractions during his incarceration.  Among those
infractions are possession of dangerous weapons and other
contraband and an astonishing nine infractions for assault,
including two stabbings and another involving an attack with a
homemade knife.  In his motion, Defendant seeks to minimize or
excuse those infractions by pointing out that they occurred some
years ago, when he, a man of relatively small stature, was
acclimating to prison life. (Motion at 37; Ex. 1 to Mot. [dkt.
no. 933-1], at 2.)  While it might be that Defendant has not had
a "violent episode" in several years, his most recent infraction
was in 2018 when he was disciplined for having a dangerous
weapon, as well as drugs and alcohol.  Not only does this
infraction belie his claim to have "grown into a peace broker,"
(Ex. 1 to Mot. [dkt. no. 933-1], at 2), it hardly betokens a
person who is rehabilitated and ready to return to a law-abiding
life.  This steady stream of serious disciplinary infractions,

in the Court's view, disqualifies this Defendant from
demonstrating that he will not be a threat to public safety if
he were released.

For the sake of completeness, the Court will consider the
"extraordinary and compressing reasons" Defendant relies
on.  The Court will first address the non-section 3553(a)
factors:  Defendant's remorse and contrition, his
rehabilitation, his reputation among BOP staff, and the threat
of Covid-19.

Taking the last first, Covid-19 does not constitute an
"extraordinary and compelling circumstance[] warranting release"
because Defendant is only 53 years old, is fully vaccinated,
(Ex. A. to Letter from M. Colson ("Gov. Opp.") [dkt. no. 936-1],
at 26), and reports no medical conditions that would put him at
special risk if he contracted Covid-19.

With respect to Defendant's "remorse, contrition, and
complete rehabilitation, (Mot. at 35-42), the Court is not
persuaded.  First, at sentencing, Judge Kram observed:  "I don't
think that Mr. Defendant has ever accepted his responsibility,
he's never evinced recognition and acceptance of personal
responsibility [for] his conduct."  (Sentencing. Tr. at 30.)
While friends attest today to Defendant's acceptance of
responsibility, (see, Ex. 10 to Mot. e.g., Motion, Ex. 10
(Letter from Jeanine Soropuru) [dkt. no. 933-10] (stating that
Defendant has "never tried to defend, minimize, or explain away

10

his activities"), the Government points to his recent statement
that his criminal conduct was attributable to his having been
"swept up in a whirlwind" and that he "fe[ll] upon an
opportunity to alleviate [his] impoverished circumstances by
selling a little of the drugs that were ubiquitous in [his]
community," (Ex. 1 to Mot. [dkt. no. 933-1], at 1).  While
Defendant says that he takes responsibility for his actions (id.
at 3), he is still busy minimizing his conduct.  These are not
the words of a remorseful defendant.

    With respect to his rehabilitation, while Defendant has
undoubtedly taken numerous courses (see Ex. 12 to Mot. (Inmate
Education Data Sheet), [dkt. no. 933-12]), his disciplinary
record, discussed above, does not bespeak rehabilitation.

    With respect to Defendant's reputation among BOP staff, he
has submitted letters from J. Mattes, Teacher/Literacy
Coordinator (Ex. 14 to Mot. (Letter from J. Mattes) [dkt. no.
933-14] (stating that Defendant has completed his GED and taken
college level courses, expressed ownership and regret for his
decisions and is capable of making better choices)); Recreation
Specialist Graves (Ex. 15 to Mot. (Letter from Recreational
Specialist, Graves) [dkt. no. 933-15] (stating that during the
past three years Defendant has become a model inmate and
mentor); M. Johnson, Religious Services Assistant (Ex. 16 to
Mot. (Letter from M. Johnson) [dkt. no. 933-16] (stating that in
the past five years Defendant's overall attitude expresses his

desire to excel in the necessary steps to reenter society and begin a new journey).  These letters are certainly complimentary and absent the disciplinary violations, might conceivably have carried the day.  In the Court's view, however, these letters pale in comparison to the letters written on behalf of other defendants by prison staff who knew those defendants for decades. (See e.g. Milan, supra, 2020 WL 1674058 at *11 ("[W]hat has impressed [Dr. Redondo] the most about Mr. Millan-Colon is the consistency he has demonstrated in both attitude and behavior over the 17 years I have known him and the fact that much of his involvement and personal growth and development came at a time when he has already resigned himself to life imprisonment.").)

Moving to the 3553(a) factors, Defendant acknowledges that his crimes were serious.  (Motion at 20.)  While he was earning millions of dollars and buying luxury cars for himself and his minions, Defendant's 50-member organization preyed on the citizens of the South Bronx, stockpiling weapons and sowing misery by selling untold amounts of heroin.  Indeed, as noted above, at sentencing Judge Kram proclaimed the Defendant to be among the most dangerous and violent offenders to come before her.

With respect to Defendant's history and characteristics, he reported a good relationship with his father, popularity in school, and support from family friends. (PSR ¶ 125; Ex. 6 to

Mot. (Letter from James Washington) [dkt. no. 933-6])
(describing Defendant's popularity and weekends spent together
outside of the Bronx with Washington's family).  While Defendant
has submitted letters from friends, e.g., Suzan Classen (Ex. 7
to Mot., (Letter from S. Classen) [dkt. no. 933-7]) (stating
that she has known Defendant for 35 years and states he could be
a help to his community); Omar Reynoso (Ex. 8 to Mot., (Letter
from Omara Reynoso [dkt. no. 933-8]) (stating that he has known
Defendant 10 years and knows of his remorse and desire to come
home), the Court notes the absence of any letters from
Defendant's family--a factor that the Court has relied on in
other cases, e.g., Panton 2020 WL 4505915 at *9 ("Mr. Panton has
also stayed in touch with his family to an extraordinary extent.
Indeed, his son who hardly knew Mr. Panton before his
incarceration, describes how his father influenced him to be the
man he is today, serving with the NYPD.  Mr. Panton's sisters
also attest to his goodness, and two of them have invited him to
live with them.  After an absence of almost thirty years, this
also shows extraordinary family support.").  Again, absent
Defendant's disciplinary record, these letters might make a
creditable case for release, even without family support.
Actions, however, speak louder than words.

While Defendant notes his age of 19-21[5] at the time of his crimes (PSR ¶ 58), Judge Kram in sentencing Defendant to life found that facts to cut the other way.  (Tr. at 30 ("I realize that you are very young and that makes it more egregious, really, that someone as young as you could have been so dangerous and caused so much harm and such terrible things to so many people.").)

In assessing Defendant's history and characteristics the Court again looks to his disturbing prison disciplinary record.

Seriousness of this Defendant's conduct and his continual breaking of the rules betoken a need for further incarceration for just punishment, and to instill respect for the law.

Defendant argues that his continued sentence constitutes an unwarranted disparity from the sentences imposed on the various co-defendants and the early release of, for example, Mr. Millan and Mr. Panton.  With respect to Defendant's co-defendants, any sentencing disparities were warranted by the fact that this Defendant was undisputely the leader of the 50-member organization and the fact that other defendants accepted responsibility for their actions, thus immediately lowering their offense levels.  More broadly, this Defendant's record does not compare favorably with the records of Mr. Millan and

---

[5] In fact, Defendant stated that he was "18/19" at the time of the conduct of conviction (Motion at 32, 34), the PSR makes clear that the conduct occurred from April 1987 to May 1989 (PSR ¶ 58), thus making Defendant between 19 and 21.

14

Mr. Panton.  Both presented remarkable evidence of rehabilitation and extraordinary remorse.  Mr. Panton had a "stellar" disciplinary record, see Panton, 2020 WL 4505915 at *9, and Mr. Millan had 3 minor infractions involving possession of too many postage stamps, see Millan, 2020 WL 1674058 at *11. In addition, Mr. Panton also suffered serious medical conditions.  As the Court found, both Mr. Millan and Mr. Panton demonstrated truly extraordinary and compelling reasons warranting release.  That is not the case with this Defendant.

## IV. Conclusion

For the reasons set out above, Defendant's motion pursuant to 18 U.S.C. Section 3582(c)(1)(A) (dkt. no. 932) is denied. SO ORDERED.

Dated:    New York, NY
          November 9, 2021

_____
Loretta A. Preska
Senior United States District Judge

15